**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| B.T., an individual, | |
| Plaintiff, | Case No. 2:24-cv-4147 |
| v. | **JUDGE ALGENON L. MARBLEY** |
| G6 HOSPITALITY, LLC, G6 HOSPITALITY FRANCHISING, LLC, and CHOICE HOTELS INTERNATIONAL, INC., | **MAGISTRATE JUDGE ELIZABETH PREST0N DEAVERS** |
| | **DEMAND FOR JURY TRIAL** |
| Defendants., | |

**AMENDED COMPLAINT**

Pursuant to this Court's September 30, 2025, Opinion and Order granting Plaintiff permission to correct the scrivener's error made at paragraph 55 (ECF No. 44), Plaintiff submits this Amended Complaint.  Nothing else has been modified in this Amended Complaint except to change the dates set out in paragraph 55.  Plaintiff   B.T. ("Plaintiff" or "B.T."), by and through her undersigned counsel, and respectfully submits her amended complaint for damages and makes the following averments.

**INTRODUCTION**

1.      Plaintiff is a survivor of human sex trafficking.

2.      B.T.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.      B.T. met her trafficker through Facebook. The trafficker picked up B.T. and a friend and took them to a hotel. Once there, the trafficker refused to let B.T. and her friend leave. Ultimately her traffickers came to control every aspect of her life. The defining factor of the

1

relationship between B.T. and her traffickers, was that each night, B.T.'s traffickers forced her to have sex with men for money.

4.      B.T. was trafficked in hotels owned by Choice Hotels International, Inc. ("Choice"), and G6 Hospitality, LLC ("G6.) (known together as the "Defendants.") B.T.'s trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

5.      At the Defendants' hotels, B.T. was forced to engage in sex with many men every day. Every new customer was another instance B.T. was forced to have sex against her will—that is to say, B.T. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6.      B.T.'s traffickers forced her onto the Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.      At some point, B.T. was able to escape the grasps of her traffickers and the prison of the Defendants' hotel rooms.

8.      B.T. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9.      B.T. brings this lawsuit in an attempt to hold the Defendants accountable for their role in her trafficking.

### OVERVIEW OF TRAFFICKING

10.      For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their

properties.

11.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[1] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

12.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[2]

13.     The Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their brand flags. Rather than taking timely and effective measures to stop profiting from this epidemic, the Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

14.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[3] However, traffickers aren't the only profiteers. The hotel industry, including the Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C.

---

[1] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.

[2] *Id.*

[3] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

§ 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Defendants knew or should have known regarding the trafficking of B.T. at the Defendants' Hotel.

16. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[5] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90 percent of commercial exploitation of children.[7]

17. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[8]

---

[4] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[5] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[6] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[7] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[8] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

18.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[9]

19.     Widely recognized signs of sex trafficking, which can be observed by hotel staff all which defendants were made of aware of, include but are not limited to:

    a.  Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b.  Individuals show signs of physical abuse, restraint, and/or confinement;

    c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e.  Individuals lack freedom of movement or are constantly monitored;

    f.  Individuals avoid eye contact and interaction with others;

    g.  Individuals have no control or possession of money or ID;

    h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

    i.  Individuals have few or no personal items – such as no luggage or other bags;

---

[9] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

j. Individuals appear to be with significantly older "boyfriend" or in the company of older males;

k. A group of girls appear to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse pr frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or usage of large amounts of cash or pre-paid cards.[10]

20. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[11] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

21. The Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' own properties. The Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris Project created for the use of the hospitality industry.

22. The hospitality industry, speaking through industry organizations, has in recent

---

[10] *Id.*

[11] Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by the Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that the Defendants and all industry participants continue to profit millions from participating in a venture in violation of § 1591(a).

23. The Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of B.T. on their properties.

24. B.T., is a survivor of sex trafficking. Key findings from the Polaris Project are that "survivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems — failed." https://polarisproject.org/national-survivor-study/

25. B.T. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 and Child Abuse Victim's Rights Act, 18 U.S.C. § 2255. Each Defendant, knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1591(a).

## PARTIES

26. Plaintiff B.T. is a natural person and a resident and citizen of Riverside, California.

27. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    a. Due to the sensitive and intimate nature of the issues, Plaintiff B.T. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her

7

to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[12]

b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[13] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[14] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[15]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[16]

---

[12] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[13] Fed. R. Civ. P. 10(a).

[14] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[15] Fed. R. Civ. P. 26(c).

[16] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

e. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

28. **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Indianapolis and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, OH 43221.

29. Choice owns, supervises, manages, controls, and/or operates the Rodeway Inn located at 607 5th St, San Bernardino, CA 92410 ("San Bernardino Rodeway Inn."

a. The Indianapolis Rodeway Inn and Quality Inn by Choice are Choice brand properties.[17]

b. Choice employees work throughout the San Bernardino Rodeway Inn by Choice. Choice employees work jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at the San Bernardino Rodeway Inn by Choice. Choice is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the San Bernardino Rodeway Inn by

---

[17] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

Choice where B.T. was trafficked.[18] Choice has an actual and apparent agency relationship with the physical property owner of the San Bernardino Rodeway Inn by Choice as to establish vicarious liability.

c. Choice controlled and dictated the actions and inactions of the San Bernardino Rodeway Inn by Choice through highly specific and detailed brand standards, policies, and procedures.

d. Choice knowingly benefited, or received something of value, from its commercial business ventures at the San Bernardino Rodeway Inn by Choice through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where B.T. was trafficked, as well as in maintaining a positive public image for the Choice brand. Choice also benefited from gathering personal data from the Wi-Fi it provided to customers including B.T. and her traffickers.

e. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

---

[18] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue- management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

30.     **Defendant G6 Hospitality, LLC** ("G6") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. The company also provides franchise opportunities for its hotel and motel brands through **G6 Hospitality Franchising, LLC[19]**.

31.     G6 is a Delaware corporation with its headquarters in Carrollton, TX.

32.     G6 maintains a registered agent in Ohio, and it can be served through its registered agent, Cogency Global, Inc., 3958-D Brown Park Dr, Hilliard, OH 43026.

33.     Motel 6 by G6 is classified as a value brand hotel.[20]

34.     G6 owns, supervises, manages, controls, and/or operates the Motel 6 located at 5101 W Century Blvd, Inglewood, CA 90304 ("Inglewood Motel 6").

     a.     The Inglewood Motel 6 is a G6 branded property.

     b.     G6 employees work throughout the Inglewood Motel 6 by G6. G6 employees work jobs including front desk and housekeeping. G6 is the principal with control over nearly every element of operations at the Inglewood Motel 6 by G6. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Inglewood Motel 6 by G6 where B.T. was trafficked. G6 has an actual and apparent agency relationship with the physical property owner of the Inglewood Motel 6 by G6 as to establish vicarious liability.

---

19 Upon information and belief, G6 Hospitality, LLC in turn owns and controls G6 Hospitality Franchising, LLC through a series of wholly owned financing subsidiaries. Defendants G6 Hospitality, LLC and G6 Hospitality Franchising, LLC will be collectively referred to as "G6".

20 *Motel 6 – An Iconic American Brand,* G6 HOSPITALITY, https://g6hospitality.com/our-brands/

c.  G6 controlled and dictated the actions and inactions of the Inglewood Motel 6 by G6 through highly specific and detailed brand standards, policies, and procedures.

d.  G6 knowingly benefited, or received something of value, from its commercial business venture at the Inglewood Motel 6 by G6 through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where B.T. was trafficked, as well as in maintaining a positive public image for the Motel 6 brand.

e.  G6 is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Inglewood Motel 6 by G6, contracting to supply services in Ohio. G6 has derived substantial revenue from services rendered in Ohio, has caused injuries to B.T. in Ohio and profited from a commercial business venture which unlawfully permitted criminals to sell B.T. for commercial sex at the Inglewood Motel 6 by G6 in Ohio.

f.  Whenever reference is made in this Complaint to any act, deed, or conduct of G6, the allegation is that G6 engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of G6.

## JURISDICTION AND VENUE

35.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because

12

this action arises under the laws of the United States.

36. The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

37. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants Choice, RRI, and RRF.

## FACTUAL BACKGROUND

### INTRODUCTION

38. B.T. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255.

39. The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of reasonable care.

40. An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[21] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

41. As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide

---

[21] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

policies and procedures regarding suspected incidents of human trafficking at the branded properties—despite the general knowledge in the industry and their own corporate records that human sex trafficking was happening in the hotel industry and in their branded properties. Furthermore, Defendants, did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

42.     Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish a mandatory and secure reporting mechanisms at the point of sale.

43.     Despite the proven ability to respond to important societal issues such as COVID-19 by modifying the brand standards to keep guests safe, Defendants did nothing in the face of the human sex trafficking epidemic in their industry.  Instead, they continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex trafficking.

44.     Defendants thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its branded properties. Defendants failed to implement appropriate policies and procedures that a reasonably diligent corporation would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their branded properties.

45.     With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like B.T. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

46.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are

14

the result of continued instances of ongoing violent traumatizing sexual exploitation.

47. Plaintiffs' injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period. A trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting the hotel defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by Plaintiff.

48. Plaintiffs' injuries—particularly Plaintiff's ongoing mental, emotional, and psychological injuries—have no reasonable basis on which to determine the relative contribution of a particular defendant conduct to the single harm.

49. Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. §1595(a). Thus, Defendants are jointly and severally liable for the Plaintiff's damages in this case.

## THE SEX TRAFFICKING OF PLAINTIFF B.T.

50. B.T. met her trafficker when she was just fourteen (14) years old.

51. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, B.T. was held captive and sold for sex by her traffickers.

52. During the time that she was trafficked, B.T.'s traffickers frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with B.T.

53. Throughout her trafficking, B.T.'s traffickers connected with "johns" by posting or

15

causing to be posted advertisements on Backpage and Mega Personals advertising for B.T.'s availability for commercial sex. B.T.'s traffickers posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

54. B.T. was forced to have sex with multiple "johns" every day she was trafficked in the Defendants' hotels.

55. From approximately 2014 through 2015, while under the coercive control of trafficker, B.T. was imprisoned in hotel rooms rented by her traffickers and forced her to have sex for money. During that time, B.T. was trafficked in the following hotels:

   a. San Bernardino Rodeway Inn located at 607 5th St, San Bernardino, CA 92410.

   b. Inglewood Motel 6 is located at 5101 W Century Blvd, Inglewood, CA 90304.

56. During the time she was trafficked, B.T.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals.

57. While at the Defendants' hotels, B.T.'s traffickers violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape.

58. During her captivity at Defendants' hotels, B.T. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned in the Defendants' brand hotels listed above.

59. At the above listed hotels, B.T. encountered the same staff on multiple occasions. The Defendants' staff would have seen the signs of B.T.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of the Defendants' properties as well as signs of malnutrition and poor health.

60. Every time B.T. interacted with the Defendants' staff, it was readily apparent that

16

B.T. was under the control of her traffickers. B.T.'s traffickers, who were significantly older than B.T., checked in to the Defendants' hotels using their own names.

61. B.T.'s traffickers followed a repetitive and routine procedure during stays at the Defendants' hotels and the Defendants' hotels knew or should have known of B.T.'s trafficking because of a variety of factors detailed below:

**THE SEX TRAFFICKING OF B.T. AT THE SAN BERNARDINO RODEWAY INN**

62. Plaintiff B.T. was subjected to sex trafficking at the Choice branded, Indianapolis Rodeway Inn located at 607 5th St, San Bernardino, CA 92410.

63. Plaintiff and her traffickers stayed at this Indianapolis Rodeway Inn by Choice between 2014 and 2015.

64. On one occasion at San Bernardino Rodeway Inn by Choice, B.T. and her trafficker check out of their room late, and the front desk staff threatened to call the police because an unusually large number of used condoms and dirty linens were found in the room. However, the San Bernardino Rodeway Inn by Choice, allowed B.T. and her traffickers to leave, and did not inquire about B.T.'s safety or involve law enforcement.

65. At the San Bernardino Rodeway Inn by Choice, there was constant foot traffic in and out of B.T.'s room. At all hours of the day and the night, the staff witnessed "johns" – who were significantly older than B.T. – come into the main entrance and to B.T.'s room. The staff also had access to security camera footage documenting the constant stream of buyers from cameras placed throughout the hotel.

66. B.T.'s traffickers were very violent with her at the San Bernardino Rodeway Inn by Choice, and loud sounds of abuse and B.T.'s screams for help could often be heard from the room.

67.　　Further, with each stay at the San Bernardino Rodeway Inn by Choice, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Unusually large number of male visitors asking for B.T. and her traffickers at the front desk; Visible signs of prior and private physical abuse; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Loud noises of abuse or other emergency audible to staff or other rooms; and Loitering and soliciting on hotel grounds.

68.　　Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the San Bernardino Rodeway Inn by Choice.

69.　　These red flags were open and obvious to anyone working at the San Bernardino Rodeway Inn by Choice.

### THE SEX TRAFFICKING OF B.T. AT THE OLENTANGY RIVER MOTEL 6

70.　　Plaintiff B.T. was subjected to sex trafficking at the G6 branded Inglewood Motel 6 located at 5101 W Century Blvd, Inglewood, CA 90304.

71.　　Plaintiff and her traffickers stayed at Inglewood Motel 6 by G6 in 2015, frequently staying for weeks at a time, encountering the same staff, within this period.

72.　　B.T.'s traffickers were very violent with her at the Inglewood Motel 6 by G6, and loud sounds of abuse and B.T.'s screams for help could often be heard from the room.

73.　　At the Inglewood Motel 6 by G6, B.T. would escort each "john" to her room. Each time a "john" came to sexually exploit B.T., the Inglewood Motel 6 by G6 staff would witness B.T. leave her room with a male significantly older than her and walk them to the entrance. Then,

the staff would see B.T. meet another male and walk with him through the hotel lobby and up to her room. This cycle would repeat hundreds of times throughout the night and day. The foot traffic was also accessible to staff via footage from security cameras placed throughout the hotel.

74.     Further, with each stay at the Inglewood Motel 6 by G6, it resulted in several consistent red flags, including, but not limited to: Paying for stays in cash; Paying for extended stays on a day-by-day basis; Requesting a room away from other guests; Obvious signs of illegal drug use; Frequent requests for linen changes; Unusually large number of used condoms in the trash; Unusually large number of male visitors asking for B.T. and her traffickers at the front desk; Visible signs of prior and private physical abuse; Unusually large number of male visitors coming in and out of the room; Asking the front desk not to be disturbed; Women wearing clothing inappropriate for the weather; Loud noises of abuse or other emergency audible to staff or other rooms; and Loitering and soliciting on hotel grounds.

75.     Plaintiff was repeatedly raped and otherwise sexually abused hundreds of times at the Inglewood Motel 6 by G6.

76.     These red flags were open and obvious to anyone working at the Inglewood Motel 6 by G6 and lasted continuously for three months.

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS**

77.     Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[22] The United Nations,[23] international

---

[22] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[23] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

non-profits,[24] and the U.S. Department of Homeland Security,[25] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

78.     For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

79.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[26] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[27] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the

---

[24] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[25] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

[26] *The Blue Heart Campaign,* UNITED NATIONS (2022), https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.

[27] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

80. The Defendants, on information and belief, have access to individual hotel location do-not-rent lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

81. The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

82. The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

83. A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

## **CHOICE**

84. Defendants Choice knew and communicated to franchises and hotel management that trafficking was often associated with other criminal activity, including drugs and assaults.

85. Countless tales of tragedy, which upon information and belief Choice knows about, establish the entrenched and pervasive nature of Choice's role in providing a venue where sex trafficking has continued, unabated, for years. For example, reviews of its branded properties,

21

which upon information and belief Choice monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and Choice's knowledge of the same.

86.     Choice has access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations.

87.     Choice has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

88.     Upon information and belief, a brief examination of just a handful of examples for the San Bernardino Rodeway Inn by Choice suffices to show the extraordinary frequency with which Choice has long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations.

89.     Upon information and belief, that has become public through news stories establishes the entrenched and pervasive nature of Choice's role in providing a venue where sex trafficking has continued unabated for years.

90.     This sampling of news stories, reviews, and other public information establishes that, at the time B.T. was trafficked at the subject properties, the Choice Defendants knew or should have known that:

    a. There was widespread and ongoing sex trafficking occurring at Choice Branded properties.

    b. Sex trafficking was a brand-wide problem for Choice originating from management level decisions at their corporate offices in Maryland.

    c. Choice franchisees and hotel staff were not taking reasonable steps to identify

and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

d. Choice's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

e. Choice and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

91. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Choice continued to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**G6 Hospitality**

92. Defendants G6 knew and communicated to franchises and hotel management that trafficking was often associated with other criminal activity, including drugs and assaults.

93. Countless tales of tragedy, which upon information and belief G6 knows about, establish the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued, unabated, for years. For example, reviews of its branded properties, which upon information and belief G6 monitors regularly, also show the pervasiveness of sex trafficking at its branded properties and G6's knowledge of the same.

94. G6 has access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations.

95. G6 has access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

96.     A brief examination of just a handful of examples for Motel 6 by G6 suffices to show the extraordinary frequency with which G6 has long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations.

   a. Regarding a stay in July 2015 at the Inglewood Motel 6 by G6, a hotel customer wrote a review saying, "Stayed a while back when they still had balconies. Room was not bad, 2 beds, tv, sink, ice machine on floor and kidney shaped pool next to Century blvd. I used to hang out in the 405 forest right behind the building and we used to see parties here all the time. Prostitutes would stand out in the balcony completely naked, drinking booze. That and young'uns using the rooms for parties. Balconies are long gone, not sure if druggies and hookers are still regulars. Do see the occasional tourist who accidentally stayed here. Always funny to see their reaction."

   b. Regarding a stay in April 2011 at the Inglewood Motel 6 by G6, a hotel customer wrote a review saying, "I will give points to the staff that were very helpful and friendly..... but, you can find somewhere else where you will feel safe and have a much better room. It is right off the freeway but there is alot of shady people that hang around. Not kidding when I say this, but checked in at 10pm and checked in right after a hooker! And yes, You could tell she was a hooker! Leaving the next morning coming down in the elevator was a condom wrapper! Next to my car was an empty box of condoms. Nice!"

   c.  Regarding a stay in July 2012 at the Inglewood Motel 6 by G6, a hotel customer wrote a review saying, "Too get away for the weekend with the kids, we decided to use this facility. The pool was the only moment of decency. Outside of that, its

24

trash. The hallways smelles like marijuana, the lobby was full of vagrants, and the service was poor. We were inconvienienced because of an error the trainee clerk made, and they kept threatning to put us out. My kids were stressed out, and by morning, they (after they kept my kids on egde all night) had the nerve to come knockin on the door early! And I couldnt book another crappy nighg due to their error. My kids were devasted and upset. This hotel sucks! And they really need to stop slandering motel 6 good name. They didnt leave the lights on for us,....at all. I wouldnt recommend this place to anyone but pimps and prostitutes, since thats who hovered in the lobby mostly. Four thumbs down!!"

d. Regarding a stay in January 2010 at the Inglewood Motel 6 by G6, a hotel customer wrote a review saying, "Why Motel 6? Have a dog (in LA there are not a lot of dog-ok hotels and I'm between homes). The motel I think SHOULD take responsibility for making the local police step up for it being safe since we have to walk to go get meals. But not only do they not do this, with the FIRST incident - a vagrant hitting me on the back of the head making me very scared - the front desk staff laughed. The second incident, a dog attack where half of my nose was bitoff, blood dripping every where - well they didn't laugh that time. Isit the motel's fault? NO. Is it the motel's problem? VERY MUCH YES -DO NOT STAY HERE. As a ps, there's a dead dog on the front walkway which has been there for now over a week."

97. Upon information and belief, information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years.

98.     Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of G6 Branded properties.

99.     Upon information and belief, each Defendant monitored criminal activity occurring at G6 Branded hotels and thus was aware of these incidents and many similar incidents at G6 properties around the country.

100.     Upon information and belief, upper-level executives of the G6 Brand Defendants monitored news stories and law-enforcement reports regarding criminal activity at G6 Branded hotels. Upon information and belief, the public relations department for the G6 Brand Defendants would circulate communications discussing criminal activity, including human trafficking and prostitution, at G6 Branded properties.

101.     This sampling of news stories, reviews, and other public information establishes that, at the time B.T. was trafficked at the subject properties, the G6 Defendants knew or should have known that:

    a.  There was widespread and ongoing sex trafficking occurring at G6 Branded properties.

    b.  Sex trafficking was a brand-wide problem for G6 originating from management level decisions at their corporate offices in Texas.

    c.  G6 franchisees and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

    d.  G6's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

e. G6 and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

102. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, G6 continued to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

## DEFENDANTS FACILITATED THE TRAFFICKING OF B.T.

103. Each Defendant is a signatory of the Code[28] and thereby has promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all these policies, and continue to unlawfully benefit from the trafficking on their properties.

104. Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

105. Defendant G6 is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and G6 publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, G6 should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

106. Defendants profited from the sex trafficking of Plaintiff B.T. Defendants rented rooms to and provided Wi-Fi to B.T.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where

---

[28] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

27

B.T. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of B.T.'s trafficking.

107. Defendants benefited from the steady stream of income that B.T.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that B.T.'s traffickers and customers rented where B.T. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time B.T.'s traffickers and customers used Defendants' Wi-Fi to advertise and solicit B.T. for commercial sex.

108. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where B.T. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

109. Moreover, Defendants repeatedly collected data on B.T., her traffickers, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of B.T.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants would have taken proper measures, Defendants would not have profited from B.T. and other victims like her being trafficked at their locations.

110. Defendants discussed, developed, and implemented uniform policies and

procedures to identify, and mitigate the risk of human trafficking occurring at their properties, including the hotels where B.T. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

111.    Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the properties where B.T. was trafficked and reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

112.    In addition, Defendants had access to much of this data through the management of centralized data systems it required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

113.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

   a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

   b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

29

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

114. As a direct and proximate result of these egregious practices on the part of the Defendants, B.T. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS

115. Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendants, for Parent Hotel Corporations to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

116. Defendants provide their branded properties with signage on and in front of the

building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

117.    Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a large extent controlled by the Hotel Defendants. Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[29]

118.    Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

119.    Upon information and belief, per the relevant franchise agreements,[30] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

120.    Upon information and belief, the Hotel Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

---

[29] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

[30] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

121.     It is further a standard practice in the hospitality industry, upon information and belief, followed by all Hotel Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

122.     The Hotel Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. Upon information and belief, the Hotel Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

123.     On information and belief, the Hotel Defendants utilize some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

124.     Under federal labor regulations, the Hotel Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked and are subject to joint employer liability.

125.     As seen by citations herein to Defendants' websites, each shares or co-determines those matters governing the essential terms and conditions of employment  Each Defendant sets the essential terms and conditions of employment, including hiring, training, retention, advancement of staff, and setting rates of pay. In particular, Defendants promulgated policies, procedures, and standards governing the hiring, training, retention and advancement of Hotel staff, including setting rates of pay.

126.     Of particular importance, the Hotel Defendants create and promulgate policies relating to training employees to recognize and respond to human trafficking, and the Hotel Defendants determine whether such training shall be mandatory.

127.     Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, the Hotel Defendants have failed to

32

mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked.

128.     On information and belief, the Hotel Defendants require their hotel locations to pay approximately 10% of gross revenue back to the Hotel Defendants for the privilege of using the Hotel Defendants' names and following their brand standards.

129.     The stringent control and standardization of operations across Defendants' branded properties, including mandatory use of specific reservation and payment systems, not only streamline corporate oversight but also optimize revenue streams. These systems, while ostensibly for operational efficiency, also inadvertently facilitated the booking processes used by traffickers, thereby increasing room occupancy rates and directly benefiting Defendants financially.

**CHOICE**

130.     Choice exercises day-to-day control over the Indianapolis Rodeway Inn and Indianapolis Quality Inn by Choice and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over the Indianapolis Rodeway Inn and Indianapolis Quality Inn by Choice and, as either direct subsidiaries or under the terms of its franchise agreements.

131.     Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a.  Requiring the branded locations to use Choice's property management system;

    b.  Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

c. Requiring branded locations to keep audit reports and other records;

d. Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

e. Providing marketing requirements and standardized marketing services for the branded locations;

f. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h. Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.

132. Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.

133. Choice controls uniform and required reservation, marketing, customer support

34

systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.

134. Choice mandates usage of a cloud-based centralized property management system called Choice ADVANTAGE to its branded locations.

135. Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.

136. Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Indianapolis Rodeway Inn and Indianapolis Quality Inn by Choice.

137. Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.

138. Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

139. Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.

140. Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.

**G6**

141.    G6 exercises day-to-day control over the Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over the Motel 6, as either direct subsidiaries or under the terms of its franchise agreements.

142.    Upon information and belief, G6 controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

    b. Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

    c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

    d. Requiring brands to purchase products through G6's e-procurement marketplace system or from approved suppliers;

    e. Requiring branded properties to pay fees based of the percentage of gross room revenues;

    f. Providing advertising requirements and standardized marketing services for the branded locations;

    g. Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

36

h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

i. Regulating employment policies at branded location including training and orientation materials for staff;

j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the branded property without G6's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.[31]

143. 143. G6 jointly employs all staff located at the Motel 6 by G6 where B.T. was trafficked. G6 shares or co-determines those matters governing the essential terms and conditions of employment. In particular, Defendants promulgated policies, procedures, standards governing the hiring, training, retention and advancement of Hotel staff, including setting rates of pay. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

144. G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.

145. G6 requires branded properties to use a centralized, cloud-based reservation and

---

[31] *See e.g.* 2017 Motel 6 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/motel-6-2017fdd-summary/motel-6-2017-fdd/

property management system.

146.     G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.

147.     G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.

148.     G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.

## TOLLING OF LIMITATIONS

149.     To the extent Defendants assert an affirmative defense of limitations, B.T. invokes the discovery rule. At the time she was harmed and through at least 2014, B.T. was under the coercion and control of traffickers who drugged her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom.  As a result, B.T. lacked the information and capacity to understand her injuries and their legal causes.

150.     150. Thus, B.T. did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her traffickers, B.T.—through no fault of her own—lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of B.T. being kept under the control, coercion, and manipulation of her traffickers, which Defendants facilitated.

151.     At the time B.T. was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at

38

Defendants' hotels or that she was a person "trafficked", much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

152.     To the extent Defendants assert an affirmative defense of limitations, Jane Doe (JT) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, B.T. faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before

153.     B.T. filed this lawsuit.

154.     While under the control of her traffickers through at least 2014, B.T. did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. B.T. could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

155.     To the extent Defendants assert an affirmative defense of limitations, B.T. also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

156.     B.T. was subject to continuous trafficking at the subject Motel 6 through at least 2014, which is not more than 10 years before B.T. filed this lawsuit.

157.     This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject Defendants' Hotels and Defendants' ongoing ventures with one another and with criminal traffickers at those Hotels.

## CAUSES OF ACTION

39

## COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
## (AGAINST ALL DEFENDANTS)

158. Plaintiff incorporates each foregoing allegation.

159. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

160. Defendants are liable as perpetrators within the meaning of 18 U.S.C. § 1595(a) because in the ways described above, each Defendant knowingly or recklessly participated in harboring, maintenance, and/or other acts in further of sex trafficking, including the sex trafficking of B.T. and each Defendants knowingly benefitted, by receiving financial and other compensation, through their participation in a venture that they knew or were reckless in not knowing involved the trafficking, harboring, and maintenance of sex trafficking victims in exchange for financial benefits. 18 U.S.C. §§ 1590(a), 1591(a)(2), 1593A.

161. Furthermore, Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

162. Defendants have continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply

and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of Plaintiff when they knew or should have known that violations of §1591(a) were occurring.

163. Despite knowledge of B.T.s sex trafficking by Defendants, B.T.'s traffickers were able to continue renting rooms for the sexual exploitation of B.T.

164. Each Defendant participated in a venture together and with, among others, B.T.'s traffickers. Defendants had an ongoing business relationship and association in fact with B.T.'s traffickers. Despite knowing or having reason to know that B.T. was being sex trafficked in violation of the TVPRA, Defendants continued to rent rooms to her traffickers, providing a secure venue for B.T.'s sexual exploitation. B.T.'s sex traffickers used Defendant's Hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Each Defendant profited while B.T.'s trafficker was able to rent a secure venue to earn profits by trafficking B.T. Each Defendant participated in the venture by continually renting rooms to B.T.'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of B.T.'s trafficking.

165. Each Defendant's failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including B.T., enabled and contributed to her sex trafficking.

166. The facts alleged establish that each Defendant knowingly benefitted, financially or by

receiving anything of value, from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

167. B.T. further alleges that, as a result of the relationship between Defendants and their branded properties, Defendants are vicariously liable for the acts of their branded properties, including at the subject property. Defendants and their branded properties jointly controlled the terms and conditions of employment for staff, making them joint employers. Factors that support this allegation include shared profits, standardized employee training, strict rules of operation, control over pricing and reservations, regular inspections, operational support, and Defendants' right to terminate franchise agreements with their branded properties, including the subject property, for failing to comply with these requirements. Therefore, Defendants retained control, or the right to control, the mode and manner of work contracted for, making them responsible for the acts and omissions of staff and branded properties.

168. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties. The actions, omissions, and/or commissions alleged in this pleading were the "but for"' and proximate cause of Plaintiff's injuries and damages, therefore Defendants are jointly and severally liable.

**COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA")**
**(AGAINST ALL DEFENDANTS)**

169. Plaintiff incorporates each forgoing allegation.

170. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

171. Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

172. Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those

42

violations.

173. Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

174. Pursuant to 18 U.S.C. § 2255(a), Plaintiff B.T. is entitled to a civil remedy for minors who are victims of violations of Chapter 110 of Title 18, including sexual exploitation and trafficking.

175. Defendants knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2). As a minor, there is a legal presumption that any commercial sex act involving B.T. was induced by force, fraud, or coercion, as minors cannot legally consent to such acts.

176. Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her traffickers rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

177. Defendants knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

178. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.     Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.     Disgorgement of profits obtained through unjust enrichment;

c.     Restitution;

d.     Statutory and/or treble damages, where available;

e.     Punitive damages;

f.     Attorneys' fees and expenses;

g.     The costs of this action;

h.     Pre- and post-judgment interest; and

i.     Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: September 30, 2025

Respectfully submitted,

*/s/ Penny L. Barrick*
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800

44

E: penny.barrick@babinlaws.com /
steven.babin@babinlaws.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2025, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's case management and electronic filing system.  Parties may access this filing through the Court's case management and electronic filing system.

Respectfully Submitted,

***Penny L. Barrick.***
Penny L. Barrick

45